IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT V. RITZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05 C 2415 |
| ) | |
| JO ANNE B. BARNHART, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION AND ORDER REGARDING
PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

JAMES F. HOLDERMAN, District Judge:

Robert V. Ritz ("Ritz") applied for Disability Insurance Benefits on April 26, 2002, claiming that he has been disabled since March 2, 2001 due to ulcerative colitis, gastroesophageal reflux disease ("GERD"), nerves, fatigue, pain, and anxiety. Ritz's claim was denied initially, upon reconsideration, and after a hearing before an administrative law judge ("ALJ"). The Appeals Council then instructed the ALJ to reconsider the decision. The ALJ held a second hearing on October 4, 2004 and again denied Ritz's claim on November 22, 2004. The Appeals Council declined to review that decision, making the ALJ's second decision the final decision of the Commissioner of Social Security. Ritz filed this lawsuit, appealing the November 22, 2004, decision of the ALJ. Before this court are cross-motions for summary judgment submitted by Ritz (Dkt. No. 30) and the government (Dkt. No. 32). For the reasons stated below, the court grants Ritz's motion for summary judgment and denies the government's cross motion for summary judgment.

1

BACKGROUND

Taking facts from the administrative record ("A.R."), the court summarizes Ritz's alleged claim of disability. Ritz was 58 years old at the time of the October 4, 2004 hearing with a 12th grade education. (A.R. at 17.) In the past, Ritz had worked as a disc jockey, a computer consultant, a stock worker, and a copy machine repairman. (A.R. at 141, 264-65.) Since the onset of his alleged disability on March 2, 2001, Ritz has held several brief temporary jobs that, the ALJ assessed, do not count as a substantial gainful activity that would disqualify him for benefits. (A.R. at 17.)

A.   Medical History

Ritz began suffering from ulcerative colitis in 1965 when he was 19 years old. (A.R. at 111.) He was hospitalized overnight once for the condition in the mid-seventies. (A.R. 151.) Ritz was also diagnosed with GERD after a visit to the emergency room in November 2000. (A.R. at 176.) In 2001, Ritz's ulcerative colitis began to worsen due to, he believes, the stress of his job as a computer consultant. (A.R. at 86.) In June 2002, at a visit with his then-gastroenterologist, Dr. Bregman, Ritz described symptoms resulting from ulcerative colitis of cramps and urgency but Ritz did not report having blood in his stool. (A.R. at 181.) Ritz was also having up to 4 bowel movements a day in June 2002. (A.R. at 181.) Despite being advised to get a colonoscopy in the mid-eighties, Ritz did not have his first colonoscopy until June 2002 when he began to see Dr. Bregman. (A.R. at 181.) The colonoscopy confirmed the diagnosis of ulcerative colitis and noted "focal inflammatory change throughout the colon." (A.R. at 183.) Dr. Bregman diagnosed Ritz with acute colitis with mild to moderate activity, and prescribed 500 mg of Asacol, an anti-inflammatory medication, but concluded that Ritz was "able to do all"

work related activities. (A.R. at 184, 186.)

Ritz also saw a doctor, Dr. Grayson, at the behest of the Social Security Administration several months later in September 2002. At that time, Ritz reported to Dr. Grayson that his bowel movements occurred up to 12 times a day, sporadically, and were aggravated by stress, leading Dr. Grayson to conclude that Ritz had "probable chronic ulcerative colitis. (A.R. at 187-89.) The state agency also referred Ritz to Dr. Jacobs, a psychologist, who assessed Ritz as having a "somatization disorder," a "generalized anxiety disorder," and a "rule in obsessive-compulsive personality disorder." (A.R. at 194.) In addition, at the Social Security Agency's request, physician Dr. Pilapil submitted a non-examining evaluation of Ritz in July 2002, concluding that Ritz could perform a full range of medium work. (A.R. 209-16.) Dr. Papey, a second physician, affirmed the evaluation in November 2002. (A.R. at 209.)

B.  July 30, 2003 Hearing

During the first hearing on July 30, 2003, Ritz, represented by counsel, testified that he had reduced his workload to short-term jobs and then had to stop working completely because stress from those jobs aggravated his ulcerative colitis. (A.R. at 251, 255.) In discussing the symptoms of his ulcerative colitis, Ritz explained that the frequency of his bowel movements varied based on his stress levels, but it could rise to 10 to 12 times a day at the "spur of the movement." (A.R. at 250, 260.) In addition, Ritz suffered from fatigue. (A.R. at 255.) At the time of the hearing, Ritz had stopped seeing Dr. Bregman due to expense, and general practitioner Dr. Obregan was his current doctor. (A.R. at 244.) Ritz testified that he was still taking the Asacol and Prevacid that Dr. Bregman had originally prescribed for him. (A.R. at 244, 252.) In terms of his physical abilities, Ritz attested that he could lift up to 80 or 90 lbs. and

3

that he could "walk pretty good" and walked his dog for about 15 or 20 minutes every day. (A.R. at 250.) A vocational expert ("VE") also testified, classifying Ritz's past work as a disc jockey as heavy, skilled labor (as performed by Ritz) and Ritz's past stock work as light, unskilled labor. (A.R. at 267.) In response to a question from Ritz's counsel, the VE stated that Ritz's past jobs would not accommodate sudden frequent urgent breaks up to 10 or 12 times a day. (A.R. at 268.)

After hearing the testimony, the ALJ rejected Ritz's claim in a brief decision, finding that Ritz's limitations were not "totally substantiated by the record" and concluding that Ritz had a residual functional capacity for medium work and could perform his past relevant work as a disc jockey, computer worker, copy machine repairman, and stock worker. (A.R. at 43.) The Appeals Council vacated the decision and remanded the case for the ALJ to obtain additional evidence of Ritz's ulcerative colitis and mental impairments, finding that the ALJ ignored Dr. Jacobs's psychological report and determining that the ALJ did not properly assess Ritz's alleged mental and physical impairments in relation to his symptoms. (A.R. at 50.)

After the Appeals Council remanded the case, the Social Security Administration sought a psychological exam of Ritz from Dr. Peggau in July 2004. According to Dr. Peggau, the "[r]ecords suggest a somatization disorder and generalized anxiety disorder." (A.R. at 231.) Yet, Dr. Peggau concluded that from a psychological standpoint, Ritz was "able to interact appropriately with coworkers, supervisors, and the public." (A.R. at 231.) In addition, Dr. Peggau reported that Ritz was "very vague" in reporting his consumption of alcohol, stating that he drinks "very moderately." (A.R. at 229.) When pressed as to the actual frequency of his consumption, Ritz responded by saying "it depends on life! When something aggravates me I

4

have a drink or two." (A.R. at 229.) Dr. Peggau noted that alcohol would exacerbate his ulcerative colitis. (A.R. at 229.)

C.  October 4, 2004 Hearing

The ALJ held a second hearing on October 4, 2004. Ritz attended the hearing this time without counsel. (A.R. at 273.) When asked by the ALJ to explain the primary problems preventing him from working, Ritz first discussed his stress and anxiety, attesting that he was no longer "strong enough" to handle "complaints" and "human misbehavior." (A.R. at 280.) Ritz then stated that his throat is sore all the time, his "intestines are always uncomfortable on fire," and that he was always fatigued. (A.R. at 286, 287.) According to Ritz, stress aggravates his ulcerative colitis and, as a result, he has tried to decrease his stress levels by working only short-term jobs since 1995. (A.R. at 280-81.) Due to his colitis, Ritz stated that he must eat about every two hours. (A.R at 287.) Ritz reported to the ALJ that he was no longer seeing Dr. Obregan because the free clinic where Ritz saw Dr. Obregan had closed down since the last hearing. (A.R. at 276.) As a result, Ritz stated that he was rationing his remaining pills of Asacol and Prevacid. (A.R. at 276.) Ritz also described his daily activities of taking the dog out for a walk, light housecleaning, cutting grass, playing or working on the computer, watching TV, and cooking. (A.R. at 283, 286.) With regard to his physical abilities, Ritz stated that he could lift up to 80 lbs. (A.R. at 284.) In response to the ALJ's question, "And how about walking? About how far can you walk or —," Ritz recounted that "after I rested a couple days Jo [his girlfriend] and I took the dog and walked up to the pond, which is about 1,000 feet or so. 1,500 feet. We walked there and back – . . . – let the dog run for a little bit." (A.R. at 283-84.) When asked about his consumption of alcohol, Ritz attested that he drinks about once a month as a

5

"social drinker." (A.R. at 285.)

A vocational expert ("VE") also testified at the hearing. Based on the testimony at the hearing and a review of Ritz's file, the VE determined that Ritz's past work as a disc jockey, as he performed it, was heavy and semi-skilled, although the Dictionary of Occupational Titles would normally classify the position as light work. (A.R. at 289.) The laborer position was considered light and unskilled and the computer consultant positions was medium and semi-skilled. (A.R. at 289.)

D.  The ALJ's Decision

After listening to testimony from the hearing and reviewing the record, the ALJ found Ritz to be "not an entirely credible witness" based on what the ALJ perceived to inconsistencies in Ritz's testimony at the July 30, 2003 hearing as compared to the October 4, 2004 hearing. (A.R. at 19, 20.) In characterizing Ritz as not credible, the ALJ apparently misread the record and believed that Ritz had testified at the 2004 hearing that he could only carry up to 30 lbs., in contrast to his initial testimony that he could carry 80 to 90 lbs. (A.R. at 19.) But the transcript from the 2004 hearing establishes that Ritz testified that he could still carry up to 80 lbs. (A.R. at 284.) The ALJ also construed Ritz's testimony that he had walked his dog 1,000 to 1,500 feet to mean that Ritz could only walk that amount. (A.R. at 19.) In the ALJ's opinion, that testimony contradicted Ritz's previous testimony a year earlier that he could walk 15 to 20 minutes. (A.R. at 19.) In addition, the ALJ honed in on Ritz's statement to Dr. Bregman in June 2002 that he had up to four bowel movements a day, as inconsistent with Ritz's reporting to Dr. Grayson two months later in September 2002 an increase in bowel movements of up to 12 a day. (*Id*.) The ALJ was also suspicious of what he characterized as Ritz's "vague" testimony about

his alcohol consumption, an activity that would exacerbate ulcerative colitis. (*Id*.) Further, the ALJ listed what he believed to be Ritz's daily activities, which included preparing breakfast and lunch for his live-in girlfriend, doing laundry, grocery shopping, cleaning, doing the dishes, sharing in cooking, cutting the grass, watching television, playing computer games, spending several hours on the internet, bowling, and baseball, in the paragraph discussing Ritz's credibility but made no other comment about the activities. (*Id.*) Finally, the ALJ noted that Ritz was last hospitalized in the mid-1970s and that his treatment records were "scant." (*Id*.)

The ALJ also relied on Ritz's treating doctor, Dr. Bregman, in addition to a non-treating source, Dr. Grayson, and a non-treating psychologist, Dr. Peggau, as well as a vocational expert ("VE"). (A.R. at 19.) Dr. Bregman opined that Ritz could do a full-range of work-related activities, notwithstanding his condition. (A.R. at 19, 186.) Dr. Grayson recommended no work-related limitations, and psychologist Dr. Peggau stated that Ritz could interact appropriately with coworkers, supervisors, and the public. (A.R. at 19, 188, 231.) Relying on the VE's classification of Ritz's past relevant work as light, unskilled labor, the ALJ concluded that Ritz could perform his past relevant work as a stock person (as he performed it) and a disc jockey, which would amount to light, unskilled work, although Ritz could not do his past, heavy-skilled work. (A.R. at 19.)

Following the five sequential steps laid out in 20 C.F.R. § 404.1520(a)-(f), the ALJ found that (1) Ritz has not engaged in substantial gainful activity since March 2, 2001; (2) Ritz has severe impairments of ulcerative colitis and GERD, but that Ritz's claimed mental impairments were not severe; and (3) Ritz's severe impairments of ulcerative colitis and GERD do not meet the listed impairments in Appendix 1, including 5.01 Category of Impairments, Digestive

7

System, *see* 20 C.F.R. § 404, Subpt. P, App. 1. (A.R. at 18, 19-20.) The ALJ then found that Ritz did not satisfy step four because he was able to perform his past relevant light unskilled work. (A.R. at 19-20.) Having concluded that Ritz could still perform his past relevant work, the ALJ did not reach step five.

## LEGAL STANDARDS

This court will uphold the ALJ's decision so long as it is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *see Briscoe ex. rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence means such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003) (internal quotations and citation omitted). An ALJ must articulate, at least minimally, his analysis of the evidence so that this court may follow his reasoning. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

## ANALYSIS

Ritz challenges the ALJ's decision on two overall grounds: (1) that the ALJ did not seek out as ordered by the Appeals Council additional information about Ritz's ulcerative colitis and ignored the medical evidence in the record regarding the condition; and (2) that the ALJ failed to follow Social Security Ruling ("SSR") 96-7p when finding Ritz not credible and based the negative credibility determination on factual errors. As a threshold matter and as the government's brief points out, the court does not review the ALJ's November 22, 2004, decision for whether the ALJ abided by the Appeals Council's remand order to gather additional evidence. Once the Appeals Council declines to review the ALJ's decision, the ALJ's decision becomes the final decision for the Agency and this court reviews the ALJ's decision to

8

determine whether it is supported by substantial evidence. *See Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997). The court may address Ritz's argument, however, that the ALJ ignored medical evidence regarding Ritz's ulcerative colitis. Because the credibility determination plays an important role in the ALJ's assessment of the medical evidence supporting Ritz's claims, the court will first discuss the credibility issue.

A.     Credibility

Because the ALJ is best positioned to evaluate the credibility of a witness, this court should reverse an ALJ's credibility finding only if it is "patently wrong." *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004) (internal quotations and citation omitted); *see Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). But when questioning an applicant's credibility as to symptoms of pain, the ALJ still must follow specific requirements set forth in SSR 96-7p. First, the ALJ decides whether the pain is reasonably substantiated by medical evidence. *See* SSR 96-7p at 2; *Scheck v. Barnhart,* 357 F.3d 697, 701 (7th Cir. 2004). If the testimony about pain is not corroborated by objective medical evidence, then the ALJ evaluates the effects of the reported pain on the individual's functional ability to work, taking into account the claimant's daily activities; his past work history and efforts to work; the dosage, effectiveness, and side effects of medication; the nature and intensity of the reported pain; medical evidence from treating physicians and third parties; medical evidence and laboratory findings; and the course of treatment. SSR 96-7p at 3, 5; *see Scheck,* 357 F.3d at 703. Discrepancies between the medical evidence and complaints of pain may reflect exaggerated claims of pain. *See Powers*, 207 F.3d at 435-36.

Acknowledging that the ALJ followed the first step of SSR 96-7p when the ALJ found

9

that Ritz's ulcerative colitis was a severe impairment, Ritz focuses on the ALJ's evaluation of the second step of SSR 96-7p. Ritz asserts that the ALJ did not evaluate the factors required in the second step of SSR 96-7p and based the credibility determination on "relatively minor, and factually incorrect observations." (Pl. Mot. for Summ. J. at 9.) As a result of the ALJ's credibility assessment, the ALJ did not accept Ritz's alleged limitation that he required sudden, sporadic and frequent bathroom breaks depending on his level of stress. The government responds by supporting the ALJ's evaluation, contending that Ritz's allegations were undermined by "contradictions within the record, vagueness regarding Plaintiff's alcohol consumption, activities of daily living, the opinions of treating and consultative examiners, and a "scant" medical record. (Def. Mot. for Summ. J. and Resp. at 11.) Specifically, the government argues that Ritz's asserted limitation that he needs to have access to the bathroom up to 12 times per day was not supported by medical evidence, and therefore properly rejected by the ALJ. (*Id.*)

The ALJ evaluated Ritz's disability claim on the factors listed in second step of SSR 96-7p's requirement. But in evaluating those factors for the determination of Ritz's credibility, the ALJ made two factual errors as well as several improper findings. Turning first to the factual errors, the ALJ misunderstood the testimony when the ALJ found that Ritz changed the amount of pounds he could lift in his testimony at the 2004 hearing. At both the 2003 and 2004 hearings, Ritz attested that he could lift up to 80 pounds. In addition, the ALJ misconstrued Ritz's testimony at the 2004 hearing that "after [Ritz] rested a couple days, [his girlfriend and he] took the dog and walk up to the pound, which is about 1,000 feet or so" to mean that Ritz could *only* walk that amount compared to his original testimony that he walked 15 to 20 minutes

10

with the dog. (A.R. at 283.) An appropriate interpretation of Ritz's testimony does not support the ALJ's finding.

Additionally, the other three grounds on which the ALJ bases the determination of Ritz's credibility are not proper. With regard to Ritz's daily activities, the ALJ never explained the basis for doubts about Ritz's daily activities that gave rise to a negative determination as to Ritz's credibility. *See Zurawski v. Halter*, 245 F.3d 881, (7th Cir. 2001) (ALJ should explain the inconsistencies between daily activities and complaints of pain and medical evidence). An ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (per curiam) (internal citations and quotations omitted). Moreover, the daily activities listed by Ritz when properly evaluated are not inconsistent with Ritz's described symptoms that allegedly cause him to be unable to work: the need to take frequent bathroom breaks, which is aggravated by stress; the need to eat every two hours; and fatigue. *See Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir. 2006) (cautioning ALJs against placing undue weight on daily activities when determining whether a claimant can hold a job); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (engaging in minimal daily activities does not mean that a claimant is capable of substantial gainful activity). The court also did not find evidence to support the ALJ's finding that Ritz goes bowling and plays baseball; rather Ritz told Dr. Peggau that he enjoys those activities but has not participated in them for some time. (A.R. at 19, 230.)

The ALJ also states that Ritz was "vague" about his consumption of alcohol. (A.R. at 19.) This characterization appears not to consider Ritz's testimony at the 2004 hearing, at which he stated that he was a social drinker who drinks once a month. (A.R. at 285.) The ALJ must

11

have taken the word "vague" from Dr. Peggau's evaluation. (A.R. at 19, 229.) But the ALJ did not acknowledge Ritz's testimony at the 2004 hearing on his alcohol consumption, which was specific and responsive to the ALJ's questions. An ALJ must consider and address evidence that appears to contradict the ALJ's findings. *See Zurawski*, 245 F.3d at 888. In this case, the ALJ was relying on Ritz's purported vagueness about his alcohol consumption to make an adverse credibility determination, but the ALJ never addressed Ritz's 2004 testimony on this point, which was specific.

Most importantly, since it relates to Ritz's primary alleged limitation, the ALJ determined that Ritz's statement to Dr. Bregman in June 2002 about having four bowel movements a day contradicted his statement several months later in September 2002 to Dr. Grayson that he had up to 12 bowel movements a day, aggravated by stress. The ALJ's finding that the difference in the amount of bowel movements per day is inconsistent demonstrates a lack of understanding about how ulcerative colitis affects Ritz and the disease in general. *See id.* (where medical evidence reasonably supports a claimant's complaints of pain, an ALJ cannot just ignore a claimant's allegations.) Ritz has stated that the amount of bowel movements per day directly relates to his stress level and may vary. (A.R. at 230, 250.) These statements fit with medical evidence that the symptoms of ulcerative colitis, such as urgency to go to the bathroom, "tend to come and go" and that the "unpredictable course of ulcerative colitis may make it difficult for physicians to evaluate whether a particular course of treatment has been effective or not." *See About Ulcerative Colitis*, Crohn's and Colitis Foundation of America, *available at* http://www.ccfa.org/info/about/ucp (June 6, 2006). In addition, although emotional stress does not cause ulcerative colitis, it "may influence the course of ulcerative colitis." *Id.*

There remains only one viable basis under SSR 96-7p on which the ALJ relied for the negative determination of Ritz's credibility: Ritz's medical history and course of treatment. The ALJ correctly acknowledged that Ritz has only been hospitalized once in the mid-seventies and that his medical records are "scant." This evidence possibly undermines but does not directly contradict the symptoms that Ritz claimed to experience.

The rest of the factors on which the ALJ relied, other than Ritz's medical history and course of treatment, were at best questionable and at worst entirely incorrect. It is not the court's job to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford,* 227 F.3d at 869. But the court still must make a critical review of the evidence to determine if the evidence substantially supports the ALJ's decision. *Lopez*, 336 F.3d at 539. This court finds that the ALJ's credibility determination contained critical errors and is thus patently wrong based upon the record.

The ALJ's erroneous credibility assessment directly affected the ALJ's decision to deny benefits and results in the evidence supporting the ALJ's decision to be insubstantial. *Golembiewski v. Barnhart*, 322 F.3d 912, (7th Cir. 2003). As the government points out, the ALJ must only consider those medical limitations that he has found to exist. *See Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). Because the ALJ did not believe Ritz's testimony about his symptoms, and specifically the limitation that Ritz must take frequent sporadic bathroom breaks without warning, the ALJ did not account for that limitation when determining whether Ritz could perform his relevant past work. Based on the record, the failure to account for the limitation may have affected the ALJ's determination of disability; the VE from the 2003 hearing stated that Ritz's past relevant work would not accommodate the need for frequent

13

sporadic bathroom breaks. This court's decision that the ALJ failed to consider Ritz's limitation of the need to take frequent bathroom breaks is not meant to imply that the court believes that limitation necessarily entitles Ritz to benefits; rather this court finds that the ALJ's decision in denying benefits was based on an erroneous credibility determination that did not consider that limitation. *See Gentle v. Barnhart*, 430 F.3d 865, 869 (7th Cir. 2005).

Finally, to the extent the government argues that the ALJ's finding regarding Ritz's physical capacity was supported by Dr. Pilapil's evaluation as affirmed by Dr. Papey, the government overlooks the actual basis for the ALJ's decision. The ALJ explicitly stated that he "considered but did not accept the prior opinions of the Agency's non-examining medical 'experts,'" Dr. Pilapil and Dr. Papey. (A.R. at 19.) Regardless whether those evaluations would have supported the ALJ's decision, the ALJ explicitly rejected those sources as a basis for his decision. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (government lawyers cannot advance arguments based on reasons not given by the ALJ).

## CONCLUSION

Accordingly, the court grants the plaintiff's motion for summary judgment (Dkt. No. 30) and denies the defendant's motion for summary judgment (Dkt. No. 32). Judgment is entered in favor of the plaintiff and against the defendant. The case is remanded to the Administrative Law Judge for further consideration. The case before this court is terminated.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
United States District Judge

Date: June 19, 2006